UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ABHIJIT DAS, a/k/a "Beej Das,"<br><br>Defendant | Criminal No. 23cr10160<br><br>Violations:<br><br>Counts One through Ten: Wire Fraud<br>(18 U.S.C. § 1343)<br><br>Forfeiture Allegation:<br>(18 U.S.C. § 981(a)(1)(C) and<br>28 U.S.C. § 2461(c)) |

INDICTMENT

At all times relevant to this Indictment:

General Allegations

1. The defendant, ABHIJIT DAS, a/k/a "Beej Das" ("DAS"), was a resident of Massachusetts and an attorney licensed in Massachusetts and New York.

2. Troca Global Advisors, LLC ("TGA") was a limited liability company ("LLC") that DAS organized in or about January 2020. DAS was the principal manager and director of TGA. TGA advertised its services as a boutique law and advisory firm based in Boston with an office in New York City.

3. Troca Capital Advisors, LLC ("TCA") was a Florida LLC created on or about July 26, 2022. DAS was the principal manager of TCA.

4. Person 1 and Person 2 were identical twin brothers and the co-founders and co-owners of "the Supply Company," a business-to-business supply company that sourced bulk quantities of goods and equipment including medical supplies and COVID-19 personal

1

protective equipment ("PPE"). While based in India, the Supply Company operated internationally and in the United States.

5.  "Company A" was one of the Supply Company's largest customers. Based in Maryland, Company A acquired bulk quantities of equipment for the military and first responders.

6.  "Company B" was based in California. Company B participated in, and financed some of, the Supply Company's transactions.

## The Escrow Services for the Supply Company

7.  The onset of the COVID-19 pandemic in early 2020 led to a worldwide surge in demand for PPE and other related medical products. During the pandemic, the international transfer of bulk quantities of PPE often required the services of an attorney to act as an escrow agent to hold money in trust in an escrow account and act as a fiduciary to both sides of the transaction.

8.  In or about early May 2020, Persons 1 and 2 contacted DAS to inquire about TGA's escrow services. In an email on or about May 4, 2020, DAS assured Person 1 and 2 that TGA had "*expertise . . . in commercial transactions and corporate advisory services[.]*"

9.  After a Zoom call on or about May 7, 2020, Persons 1 and 2 agreed to hire DAS and TGA to act as the Supply Company's attorney and escrow agent. DAS charged an hourly rate for legal services and told Persons 1 and 2 that he would charge a "nominal fee" for escrow services. DAS further told Persons 1 and 2 that, unlike a traditional escrow account, the Supply Company could also use the escrow account like its corporate operating account.

*The Escrow Transactions*

10. In or about June 2020, DAS opened two accounts for the Supply Company at branches of JP Morgan Chase ("JPMC") in Massachusetts: an escrow account with an account number ending in 3167 ("the Escrow Account") and an IOLTA account with an account number ending in 6730 ("the IOLTA Account").

11. Although DAS had exclusive control over the Escrow Account and the IOLTA Account (collectively, the "Escrow Accounts"), the transfer of the Supply Company's funds that DAS and TGA held in trust for the Supply Company (the "Escrow Funds") required the Supply Company's explicit authorization and agreement.

12. Persons 1 and 2 authorized and directed the transfer of Escrow Funds by emailing DAS and TGA "Escrow Payment Instructions." After making the requested transfer, DAS and TGA emailed Persons 1 and 2 and the Supply Company a "Refund Receipt" to confirm the transfer.

13. Upon their request, DAS also provided Persons 1 and 2 with "opinion letters" that purported to certify that the Supply Company had a minimum balance in its Escrow Account. In addition to opinion letters, DAS also obtained a JPMC record called a "Deposit Account Balance Summary" or "bank comfort letter" ("BCL") that claimed the Escrow Account had a particular balance. As DAS knew, because Persons 1 and 2 did not have access to the bank statement for the Escrow Accounts, Persons 1 and 2 had to rely on DAS's representations regarding the transactions and balances in the Escrow Accounts.

14. From in or about May 2021 until in or about June 2022, DAS and TGA emailed Persons 1 and 2 and the Supply Company PDF formatted documents that DAS claimed to be

3

updated financial statements ("Escrow Statements"). While not bank statements from JPMC, DAS claimed that the Escrow Statements were a complete and accurate accounting of the transactions in the Escrow Accounts ("the Escrow Transactions") and the total consolidated balance of the Escrow Funds.

15. In addition to escrow services, DAS also gave Persons 1 and 2 and the Supply Company legal, investment, and other business-related advice for which TGA charged an hourly rate and issued itemized invoices for payment. As the attorney and the escrow agent for Persons 1 and 2 and the Supply Company, DAS owed a fiduciary duty to act in their best interest and disclose all material information about the Escrow Funds.

*The Escrow Agreement for "Company A" Transactions*

16. In or about February 2021, the Supply Company received a purchase order from Company A for 6 million PPE gloves for a total of approximately $62.4 million. In or about April 2021, Company A wired a total of approximately $8.1 million to the Supply Company's corporate account at HSBC in New York (the "HSBC Corporate Account") which the Supply Company used to acquire an initial shipment of PPE gloves in China.

17. Shortly after Company A transferred a total of approximately $8.1 million to the HSBC Corporate Account, DAS warned Persons 1 and 2 that their HSBC Corporate Account was less secure than the Escrow Account and could be subject to legal actions from creditors. DAS further advised that while the creditors' claim would lack merit, any legal action could tie up the Supply Company's business operations for months. As a result, DAS counselled Persons 1 and 2 to direct Company A to transfer all future funds to the Escrow Account at JPMC instead of the Supply Company's HSBC Corporate Account.

18.     DAS communicated his advice to Persons 1 and 2 over the phone and internet. For example, on or about May 4, 2021, DAS advised Person 1 in a WhatsApp message that they should direct Company A to transfer the funds to JPMC *"because of the branch distribution, makes access and control easier"* and suggested they should tell Company A that they were *"[m]oving to a new banking partner."*

19.     In accordance with DAS's direction and advice, in or about early May 2021, Persons 1 and 2 instructed Company A to transfer the remaining funds for the purchase order, about $54 million, to the Escrow Account instead of the Supply Company's HSBC Corporate Account.

20.     On or about May 8, 2021, DAS, and Persons 1 and 2 signed an agreement with the Supply Company where DAS agreed to maintain an escrow account and act as an escrow agent for the Supply Company. In the written agreement, DAS and TGA further agreed that the *"Escrow Funds shall be segregated from the other assets of Escrow Agent and held in trust for the benefit of [the Supply Company] and the fulfillment of its obligations under the Purchase Agreement (with Company A)."* The agreement also specified the terms and conditions under which the Escrow Agent would be permitted to disburse the Escrow Funds.

21.     Between in or about May 6 and June 24, 2021, Company A wired a total of more than $54 million to the Escrow Account. Using a combination of Company A's funds wired to the Escrow Account and the Supply Company's own funds, Persons 1 and 2 and the Supply Company purchased the 6 million PPE gloves for Company A at the agreed upon price, arranged for delivery to Company A, and completed the purchase order.

Case 1:23-cr-10160-AK   Document 1   Filed 06/20/23   Page 6 of 19

*Transactions with Company B*

22. In addition to the transactions with Company A, the Supply Company also obtained financing for its transactions from Company B. Instead of the Supply Company making the initial purchase, Company B provided the funds for the Supply Company to make the purchase of PPE. Once the PPE was sold, and the Supply Company obtained the proceeds of the sale, the Supply Company then repaid Company B along with an interest payment.

23. Apart from this financing agreement, the Supply Company and Company B also entered an arrangement under which Company B bought the PPE directly from the Supply Company. A disagreement about the terms of this second arrangement led to an ongoing dispute between Company B and the Supply Company in early 2022 when Company B was unable to resell the PPE at a profit because of an increase in the availability of PPE and a drop in demand that coincided with the easing of the pandemic.

24. Citing the potential threat of an "ex parte motion" from Company B, DAS advised Persons 1 and 2 to move the Escrow Funds out of the Escrow Account to the IOLTA Account. For example, during a WhatsApp message on or about January 24, 2022, at approximately 11:35 a.m., DAS warned Person 1 that *"By design, an ex parte motion would not give you notice . . . we should move fund back to IOLTA since they escrow account is less secure."*

Overview of the Scheme to Defraud

25. Beginning in or about May 2020 and continuing through in or about October 2022, DAS devised and executed a scheme to defraud Persons 1 and 2 and the Supply Company of millions of U.S. dollars based on DAS's false and misleading representations about his transfer and expenditure of the Escrow Funds.

26. Among other things, DAS falsely claimed to have transferred millions of dollars of the Escrow Funds to outside accounts for investment and tax purposes, when in fact DAS had misappropriated millions of the Escrow Funds for his own personal use that included the purchase of real estate in Florida and the payment of personal and professional debts unrelated to the Supply Company's business.

27. DAS executed the scheme by fraudulently inducing Persons 1 and 2 to transfer their funds to accounts that DAS controlled and purportedly held or Persons 1 and 2 and the Supply Company. DAS then misappropriated the Escrow Funds without Persons 1 and 2's knowledge by transferring the fund to other business and personal accounts.

28. DAS concealed the scheme by making false and misleading oral and written statements to Persons 1 and 2 that included forged documents and false and misleading account statements.

### Acts in Furtherance of the Scheme to Defraud

29. DAS committed the following acts, among others, in the District of Massachusetts and elsewhere in furtherance of the scheme to defraud.

A. <u>DAS's Misappropriation of Escrow Funds</u>

30. While acting as their attorney and advisor, DAS fraudulently induced Persons 1 and 2 to transfer Escrow Funds to accounts under DAS's exclusive control from where DAS misappropriated the funds and concealed the theft by providing Persons 1 and 2 and the Supply Company fraudulent Escrow Statements.

31. For example, in or about August 2021, when Persons 1 and 2 told DAS they wanted to invest $1 million of the Escrow Funds in a short-term CD with JPMC, DAS convinced

7

Persons 1 and 2 that he could invest their $1 million in a more secure, higher interest investment. Instead of investing the Escrow Funds, DAS misappropriated the funds for his own personal use.

32. DAS first counseled Persons 1 and 2 to avoid a large balance in their HSBC Corporate Account because of a risk from creditors and advised them instead to transfer the bulk of their funds to the Escrow Account. Using a potential threat of litigation from Company B, DAS then convinced Person 1 and 2 to have the Escrow Funds transferred from the Escrow Account to the IOLTA Account.

33. Out of the more than $54 million that Company A and the Supply Company wired to the Escrow Account, DAS transferred a total of approximately $52 million to the IOLTA Account. Out of this approximately $52 million, DAS diverted more than $5 million to other accounts in multi-step, layered transactions to misappropriate Escrow Funds from the Supply Company.

34. The following are examples of transfers of the Escrow Funds from the IOLTA Account that DAS misappropriated from the Supply Company:

    a. Between in or about May 2021 and July 2022, DAS transferred a total of more than $750,000 from the IOLTA Account to one of TGA's business accounts, an account at JPMC in the name of Troca Global Advisors ending in 3159 (the "TGA JPMC Operating Account" or "JPMC-3159"). DAS used these funds for TGA related and personal expenses including more than approximately $90,000 for TGA employees, $39,000 for a Capitol One credit card, and $36,000 for expenses related to the "Troca One," a yacht associated with DAS's hotel business.

      b.    On or about July 7, 2021, DAS transferred approximately $40,000 from the IOLTA Account to an account for the trustee for the bankruptcy petition for Boston East Tyngsboro Holdings, LLC, DAS's hotel business.

      c.    On or about August 24, 2021, DAS transferred approximately $139,528 from the IOLTA Account to another TGA business account, an account at Enterprise Bank and Trust Company ("EBTC") in the name Troca Global Advisors ending in 1434 or a bank check to pay down a personal mortgage.

      d.    On or about December 23, 2021, DAS transferred approximately $500,000 from the IOLTA Account to open a personal investment account at Fidelity Investments for himself, an account ending in 0225 in DAS's name.

      e.    Between in or about September 2021 and June 2022, DAS transferred a total of approximately $271,000 directly from the IOLTA Account to pay for expenses related to the Troca One yacht.

      f.    On or about January 4, 2022, DAS withdrew approximately $120,520 from the IOLTA Account to buy a 2018 Range Rover in Jacksonville, Florida.  In or about late January 2022, DAS returned the vehicle, obtained a refund of approximately $120,520, and instead of returning the funds to the IOLTA Account, deposited the funds into the TGA JPMC Operating Account.

      g.    In or about February 2, 2022, DAS transferred $2,449,452 from the IOLTA Account to buy a $2.65 million residence in Boca Raton, Florida for himself that DAS put in the name of his fiancée and one of his parents.

B. <u>DAS Gives False and Materially Misleading Escrow Statements</u>

35. From in or about June 2021 and continuing until at least June 2022, DAS provided Person 1 and 2 and the Supply Company with Escrow Statements that purported to provide an accurate accounting of the Escrow Transactions. The following are examples of Escrow Statements that DAS provided to Person 1 and 2 and the Supply Company that were false and materially misleading.

    a. On or about August 5, 2021, DAS caused TGA's "accounting department" to email an Escrow Statement purportedly updated through July 31, 2021, to Persons 1 and 2 that omitted DAS's transfer of approximately $400,000 on July 12, 2021, from the IOLTA Account to two separate Boston area law firms for DAS's legal representation on a separate matter.

    b. On or about November 3, 2021, DAS caused TGA's "accounting department" to email Persons 1 and 2 an Escrow Statement purportedly updated through October 28, 2021, that falsely claimed that between August 2021 and September 2021, a total of $1 million was transferred from the IOLTA Account into a *"1230 Escrow Investments – Trust Account"* when in fact no such transfer or investment ever took place, and no such account ever existed.

    c. On or about March 21, 2022, DAS emailed Person 1 an Escrow Statement purportedly updated through December 31, 2021, along with an invoice that falsely claimed that DAS had transferred $1.125 million to an account at EBTC for a "general capital raise." In fact, the $1.125 million transfer never took place. Instead, DAS used approximately $2.7 million of Escrow Funds in or about February 2022 to purchase a residence for himself in Boca Raton, Florida.

10

C.  DAS's Material Misrepresentations Regarding the Investment of Escrow Funds

36. In response to Persons 1 and 2's questions about the availability of, and documentation for, the Escrow Funds, DAS provided false and materially misleading information as well as forged and fraudulent documents to conceal the fraud, including the following:

37. Shortly after Person 1 questioned DAS about the purported $1.125 million transfer to EBTC for a "general capital raise," DAS falsely claimed that he had transferred the funds for tax purposes and would return the $1.125 million by or about April 7, 2022, but never returned the funds.

38. On or about March 24, 2022, DAS emailed Person 1 an Escrow Statement purportedly updated through March 11, 2022, that falsely claimed that the Supply Company had approximately $4.2 million in a "High Yield Escrow Investment Account" when in fact no such account existed. In the same email, DAS also falsely claimed that the Supply Company had a total of approximately $6 million in Escrow Funds including about $2.8 million that was liquid in a *"48-hour fund"* and approximately *"$3.2 million in 45-60 day term notes"* when in fact there was no such investment.

39. On or about April 4, 2022, in response to Person 1's request for proof of funds in the Escrow Account for an international sugar transaction, DAS, over WhatsApp, at approximately 11:03 p.m., sent Person 1 a purported JPMC "Deposit Account Balance Summary" or "BCL" which in fact was a forgery. While the forged document claimed the total

11

balance in the Escrow Account was approximately $8,357,000, the total balance was only about $4 million.

40. On or about June 2, 2022, following Person 2's request for a BCL for the funds on deposit in the Escrow Account, DAS emailed Person 2 an "opinion letter" that falsely claimed that the Escrow Account had a balance of $4,812,500 when in fact the total amount of funds available in the Escrow Account was less than $1.3 million.

D. DAS's Fraudulent Representations After Persons 1 and 2 Seek Return of Funds

41. Beginning around late May 2022, after Persons 1 and 2 demanded that DAS return the (a) $1.125 million that DAS claimed he had transferred out of the Escrow Account for tax purposes and (b) approximately $4.9 million in Escrow Funds that DAS claimed he had invested, DAS falsely and fraudulently claimed that he was making efforts to return the funds and obtain documentation about the investment holdings but failed to do so and never returned the funds.

42. DAS also falsely told Person 1 and 2 that he could not provide them with any account statements for the IOLTA Account from JPMC because it was a "commingled" account mixed with other client funds, when in fact the predominant source of funding for the IOLTA Account and TGA's business operations was the Escrow Funds.

43. For example, on or about May 30, 2022, after Person 1 gave DAS wire instructions for the return of $4.9 million, DAS falsely claimed in an email that TGA would *"provide you a statement on what is liquid in the escrow account and the current liquidity timeline"* when in fact no such statement ever existed.

44. During a Zoom call with Persons 1 and 2 on or about June 2, 2022, DAS falsely

claimed that he had used two different escrow companies, Banker Healthcare Group ("BHG") and Legalist to invest the Escrow Funds. In fact, DAS had never transferred any of the Escrow Funds into any account associated with BHG or Legalist. During the same Zoom call, DAS also falsely told Persons 1 and 2 that he was unable to provide them with any account statements for the IOLTA Account because the three to four accounts that TGA was using for the Escrow Funds were commingled accounts, so there was no bank statement available to demonstrate which funds belonged to the Supply Company.

45. On or about June 4, 2022, DAS emailed Person 1 an Escrow Statement purportedly updated through May 31, 2022, that falsely claimed that the Supply Company had approximately $3.9 million in a "High Yield Escrow Investment Account" when in fact no such account or investment existed.

46. During an internet Zoom call on or about June 5, 2022, with Persons 1 and 2 and one of the Supply Company's attorneys, DAS falsely claimed that he had transferred the remaining Escrow Funds to a company called "EIT" or "Escrow Investment Trust" when in fact no such company existed.

47. In an email on or about July 14, 2022, DAS falsely claimed that he had invested, at the direction of Persons 1 and 2, millions of the Escrow Funds *"into Fidelity Investments and an Escrow Investments trust account."* In fact, Persons 1 and 2 had only authorized DAS to make a short-term $1 million investment of Escrow Funds in or about August 2021. DAS, furthermore, had not invested any of the Escrow Funds, but instead had misappropriated the funds for his own use.

48. On or about August 16, 2022, DAS emailed a letter to Persons 1 and 2 that

warned them to avoid discussing their ongoing dispute about the Escrow Funds with anyone else "*in a manner that would circumvent or negate*" the protection of the attorney-client privilege. In the same letter, DAS falsely claimed that he had transferred $1 million in Escrow Funds to the "Escrow Investment Trust 21-22" that by December 2021, had a balance of $2,574,975.94 when in fact no such investment trust or account ever existed.

49.   In or about August 2022, DAS caused Persons 1 and 2 to receive a 68-page document labeled *"Escrow Investment Trust 2021-2022"* dated July 25, 2021, that purported to contain Person 1's signature for the agreed upon investment of Escrow Funds in the Escrow Investment Trust, with the Supply Company as the grantor and TCA as the trustee, when in fact Person 1's signature was a forgery.

## COUNTS ONE-TEN
### Wire Fraud
### (18 U.S.C. § 1343)

The Grand Jury charges:

50. The Grand Jury re-alleges and incorporates by reference paragraphs 1-49 of this Indictment.

51. From in or about May 2020 through in or about October 2022, in the District of Massachusetts and elsewhere, the defendant,

ABHIJIT DAS, a/k/a "Beej Das,"

having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing the scheme to defraud, as set forth below:

| Count | Approximate Date | Description |
|---|---|---|
| 1 | May 4, 2021 | WhatsApp communication between DAS and Person 1 about "Moving to a new banking partner" |
| 2 | July 7, 2021 | $40,000 wire transfer from IOLTA Account to account at Axos Bank for the Bankruptcy Estate of Boston East Tyngsboro Holding, LLC and other related entities together with associated notices, account updates and acknowledgements |
| 3 | January 4, 2022 | $120,520 withdrawal from IOLTA Account for purchase of bank check payable to Fields PAG in Jacksonville, Florida |
| 4 | January 24, 2022 | WhatsApp communication at approximately 11:35 a.m. between DAS and Person 1 about an "ex parte motion" from Company B |
| 5 | February 2, 2022 | $2,449,452 wire transfer from the IOLTA Account to a closing attorney IOLTA account in Fort Lauderdale, Florida for the purchase of a residence in Boca Raton, Florida for approximately $2.65 million |
| 6 | March 24, 2022 | Email from DAS to Person 1 at approximately 5:18 p.m., Subject: TYD Escrow Statement |
| 7 | April 4, 2022 | WhatsApp communication from DAS to Person 1 at approximately 11:03 p.m. with JPMC Deposit Account Balance Summary/BCL |

| Count | Approximate Date | Description |
|---|---|---|
| 8 | June 2, 2022 | Internet Zoom call during which DAS told Persons 1 and 2 that DAS used BHG (Bankers Health Group) and Legalist for the Supply Company to invest the Escrow Funds |
| 9 | June 5, 2022 | Internet Zoom call during which DAS told Persons 1 and 2 he used two different escrow companies, BHG and Legalist to invest the Escrow Funds |
| 10 | August 16, 2022 | Email from DAS to Persons 1 and 2 with letter advising not to disclose the contents of the letter *"in a manner that would circumvent or negate"* the protection of the attorney-client privilege |

All in violation of Title 18, United States Code, Section 1343.

Since the defendant, ABHIJIT DAS, a/k/a "Beej Das," was on release pursuant to an order dated June 29, 2021, issued under Chapter 207 of Title 18 of the United States Code (Release and Detention Pending Judicial Proceedings) by the United States District Court for the District of Massachusetts in case number 21-cr-10200-RGS, during the commission of the offenses alleged in Counts Two through Ten as described above, the enhanced penalties of Title 18, United States Code, Section 3147(1) apply to Counts Two through Ten of this indictment.

## FORFEITURE ALLEGATION
(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

The Grand Jury further finds:

52. Upon conviction of one or more of the offenses in violation of Title 18, United States Code, Section 1343, set forth in Counts One through Ten, the defendant,

ABHIJIT DAS, a/k/a "Beej Das,"

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses. The property to be forfeited includes, but is not limited to, the following assets:

   a. A money judgment in an amount to be determined at sentencing.

   b. All funds held by JP Morgan Chase Bank, N.A. in or behalf of account number *****3159 in the name of Troca Global Advisors LLC Escrow Agent.

   c. All funds held by Bank of America, N.A. ("BOA") in or behalf of account number ********3754 in the name of MA IOLTA Trust Accounts Troca Global Advisors LLC.

   d. All funds held by BOA in or behalf of account number ********6163 in the name of Troca Global Advisors, LLC.

   e. All funds held by BOA in or behalf of account number ******9951 in the name of Abhijit N. Das and another.

   f. All funds held by Fidelity Investments in or behalf of account number ***-**0225 in the name of Abhijit Das.

   g. The real property located at 19870 Meadowside Lane, Boca Raton, Florida, including all buildings, improvements, fixtures, attachments, and easements found therein or thereon, more particularly described in the Warranty Deed

   recorded on February 8, 2022, in the Public Records of Palm Beach County, Florida, in Book 33290, Pages 0941-0942.

 h. The maritime vessel known as the "Troca One," bearing IMO 1231948 and MMSI 367738470.

53. If any of the property described in Paragraph 52, above, as being forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), as a result of any act or omission of the defendant --

 a. cannot be located upon the exercise of due diligence;

 b. has been transferred or sold to, or deposited with, a third party;

 c. has been placed beyond the jurisdiction of the Court;

 d. has been substantially diminished in value; or

 e. has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property described in Paragraph 52 above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

              A TRUE BILL

              _____
              FOREPERSON

_____
NEIL J. GALLAGHER, JR.
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF MASSACHUSETTS

District of Massachusetts: June 20, 2023
Returned into the District Court by the Grand Jurors and filed.

/s/ Noreen A. Russo
DEPUTY CLERK    at 12:32 PM